USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9/17/2025_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SOPHIANA CILUS,

                              Plaintiff,

              -against-

NYU LANGONE HOSPITALS,

                              Defendant.

---

23-CV-00440 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

## INTRODUCTION

Plaintiff Sophiana Cilus brings this action against Defendant NYU Langone Hospitals ("NYU") alleging disability discrimination based on adverse employment action, failure to accommodate, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq. See* Dkt. No. 1 ("Complaint" or "Compl."). Plaintiff also brings claims of retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and whistleblower and unlawful wage reduction claims under the New York Labor Law ("NYLL"), N.Y. Lab. L. §§ 193, 740. NYU moves for summary judgment on all claims. *See* Dkt. Nos. 46–47. For the reasons discussed below, NYU's motion for summary judgment is GRANTED as to the ADA, NYSHRL, NYCHRL, and FMLA claims, as well as the NYLL whistleblower claim, but DENIED as to the NYLL unlawful wage reduction claim.

## FACTS AND PROCEDURAL HISTORY

### I.   FACTUAL BACKGROUND[1]

Plaintiff began working for NYU as a Physician Assistant ("PA") in the Department of
Medicine/Oncology in July 2018.  J56.1 ¶ 3.[2]  Soon after, Plaintiff was transferred to the Medical
Intensive Care Unit ("MICU").  *Id.* ¶ 4.  The MICU treats both intensive-care-level patients
("ICU-level patients") and acute-level patients, which is generally a lower level of care.  J56.1 ¶¶
4–5; Dkt. 49 ¶ 11; Dkt. 48-2 (Cilus Dep. Tr. 37:14–22).  When she was first assigned to the
MICU, Plaintiff treated ICU-level patients.  J56.1 ¶¶ 4–5.  In early 2019, Plaintiff switched
positions to become an acute-level provider in which she treated non-ICU-level patients.  *Id.* ¶ 5.
Plaintiff received positive reviews in this role, earning performance ratings of "Exceeds
Expectations" in 2019 and 2020.  *Id.* ¶ 7.

#### A.  Plaintiff's Performance Improvement Plan

In or around mid-2020, as a result of the COVID pandemic, NYU determined that all
acute-level care providers needed to become competent at ICU-level care so that they could care
for critically ill patients.  Pl.'s Rep. 56.1 ¶ 9; Dkt. 49 ¶ 13; Dkt. 50 ¶ 12.  Dr. Jacklyn Hagedorn
was Plaintiff's supervising physician during this time.  J56.1 ¶ 29.  In March 2021, Dr. Hagedorn
completed an Ongoing Professional Practice Evaluation of Plaintiff for the period July 1, 2020 to
February 28, 2021.  *Id.*  In the evaluation, Dr. Hagedorn rated Plaintiff as "Satisfactory" in some
areas (such as "Patient Care" and "Professionalism") and "Needs Improvement" in others,

---

[1] The following facts are taken from the parties' Joint Rule 56.1 Statement ("J56.1"), *see* Dkt. No.
56; Plaintiff's response to Defendant's Rule 56.1 statement ("Pl.'s Rep. 56.1"), *see* Dkt. No. 59;
Defendant's Response to Plaintiff's Rule 56.1 Statement ("Def.'s Rep. 56.1"), *see* Dkt. No. 66; and the
parties' declarations and exhibits.  The facts are either undisputed or described in the light most favorable
to Plaintiff.

[2] The parties' submissions refer to Plaintiff as both an NP and an "APP," which is "an umbrella
term that encompasses a physician assistant or a nurse practitioner."  *See* Opp. Br. at 18 n.80.

including "Medical Knowledge" and "Technical/Clinical Skills & Judgment." *Id.* ¶ 30; Dkt. 52-3 at NYU000286–9.

Based on the results of the March 2021 evaluation, Dr. Hagedorn concluded that Plaintiff needed to be placed on a "Focused Professional Practice Evaluation" ("FPPE"), which NYU practitioners viewed as the equivalent of a performance improvement plan ("PIP"). J56.1 ¶ 31; Dkt. No. 49 ¶ 23. The FPPE identified five areas of improvement for Plaintiff: "her presentations on rounds and her progress notes"; "expand[ing] her medical knowledge"; "becom[ing] competent in placing central lines and alines"; "being more efficient and develop[ing] better time management skills"; and "being more flexible and adaptable on rounds." J56.1 ¶ 31.

In March 2021, other providers in the MICU expressed concerns about Plaintiff's progress in developing the skills required to care for critically ill ICU-level patients. Lauryn Wells, the Interim MICU Manager at the time, emailed John Davidson, the Senior Director of Physician Assistant Services, on March 29, 2021, stating that she was "having difficulty in motivating Sophi Cilus PA to meet educational goals set forth as part of MICU training." Dkt. No. 52-5 at NYU000745–6. In response, on March 30, 3021, Davidson wrote: "This is a patient care issue and we need her to attempt to meet the timeline. Patient safety will not be compromised but she needs to attempt before saying no." *Id.* at NYU000745. Dr. Hagedorn responded, stating:

> I'm concerned about the lack of progress and initiative that Sophie has taken regarding this issue.…I am concerned on her ability to advance to moving on to nights as well as her ability to remain in the ICU.…I think this further illustrates that the ICU may not be the best place for Sophie to remain given the circumstances of the unit acuity and need to get everyone ICU competent as safely and as efficiently as possible.

*Id.*; J56.1 ¶ 35.

3

On May 5, 2021, Plaintiff met with Dr. Hagedorn and Gargi Mehta PA, the Advanced Practice Providers Manager in the MICU to whom Plaintiff reported, to discuss Plaintiff's performance. Dkt. 49 ¶ 3; J56.1 ¶ 37. Mehta testified that, during the May 5 meeting, she and Dr. Hagedorn addressed "concerns about [Plaintiff's] case presentation skills and note writing, as well as issues with [her] efficiency and her inability to complete work in a timely manner." Dkt. 49 ¶ 25. On June 2, 2021, Mehta emailed Plaintiff stating "[y]our ECMO PIP has officially ended but there are other areas to focus and improve upon as part of your general MICU PIP." Dkt. 49-13 at PL0216. Mehta listed the following as areas for improvement:

- Note writing, in a more concise "Impression and Plan" format with each problem/diagnosis married to a plan of action
- More proactive in in [sic] coming up with the plan of care / developing the treatment plan
- Procedural competency + logging
- Participate / present in APP case conference
- Presentations - adaptable based on new vs. old known patient highlighting active issues and more succinct etc.

J56.1 ¶ 38. Mehta ended the June 2 email by stating "[y]ou're putting in the effort and we all appreciate it!" Dkt. 49-13 at PL0216.

On June 10, 2021, Mehta sent Plaintiff a calendar invitation for a June 24, 2021 check-in with herself and Dr. Hagedorn to discuss the general MICU PIP. *See* J56.1 ¶ 41. The parties dispute what took place at the June 24, 2021 meeting. Pl.'s Rep. 56.1 ¶¶ 16–17. On the same day as the meeting, Plaintiff emailed Mehta, copying Davidson, to "submit a formal request for a Personal Medical Leave of Absence." Dkt. 49-22 at NYU000349. In the email, Plaintiff explained that she had a "serious health condition that requires surgery." *Id.* Plaintiff further stated that her surgeon had scheduled a surgical procedure for July 8, 2021, and expected at least twelve weeks of leave before returning to work. *Id.* At 2:56 pm, Davidson responded to Plaintiff's email, writing "I am so sorry to hear about your condition. Please let me know how I

can support you" and providing a link through which Plaintiff could initiate her leave. Dkt. 49-21 at NYU002065. The next day, Mehta responded to the email chain, writing "I'm sorry to hear about you needing surgery as you mentioned yesterday during our meeting. Hope everything goes well. I've received your Cigna leave information 7/8-9/29." *Id.*

On June 30, 2021, Mehta emailed Scott Mellynchuk, then Manager of Employee and Labor Relations, Human Resources, and Davidson to recommend sending a PIP document to Plaintiff. J56.1 ¶ 44. Mehta wrote: "[Plaintiff] has not made improvements despite multiple meetings and detailed discussions." *Id.* In response, Mellynchuk directed Mehta to issue the PIP and file it in NYU's electronic system within two weeks. *Id.* ¶ 45. Mehta subsequently emailed Plaintiff to provide her "formal PIP." Dkt. 49-16 at NYU000773. The PIP identified "deficiencies" in Plaintiff's performance and stated "[a]t the end of this extended PIP period, we will review the recommendations and evaluate your ability to have corrected/mastered the above deficiencies in order to continue on the service. In the event, the above are not met, you would not be able to continue on the service." *Id.* at NYU000774.

### B. Plaintiff's Medical Leave and First Accommodation Request

Plaintiff underwent surgery on July 8, 2021. Def.'s Rep. 56.1 ¶ 75. On September 16, 2021, Plaintiff submitted two documents to NYU personnel: a Fitness for Duty Certification and an ADA Disability Accommodation Request Form. J56.1 ¶ 50; Dkt. 48-5 at NYU002230. On the accommodation request form, Plaintiff's doctor indicted that two functions of Plaintiff's job were impacted by her injury: standing and walking. Dkt. 48-5 at NYU002233. Plaintiff's doctor further stated that, to perform the functions of her job impacted by her disability, Plaintiff required the following accommodations for the period of September 30, 2021 to January 8, 2022: a reduced 30-hour work week, physical therapy twice weekly, periodic rest breaks, an ergonomic office chair, and reassignment to a vacant part-time APP position. *Id.* at NYU002232.

Following receipt of Plaintiff's accommodation request, NYU personnel exchanged emails about the extent to which NYU could accommodate Plaintiff's request. *See* J56.1 ¶ 51–60. Both Mehta and Davidson wrote that they could not accommodate Plaintiff's request, including because of the potential negative impact it posed to patient care. *Id.* ¶¶ 52–53. On September 21, 2021, Rashidat Ogbara, an employee in the human resources department, emailed the Hospital's internal recruiting group to see if there was "anything available to re-assign [Plaintiff] to" given her requested accommodations. *Id.* ¶ 59; Dkt. 55-9 at NYU000932–33. On October 1, 2021, Ogbara informed Plaintiff that there were "no positions available that fit [her] schedule and physical limitations." J56.1. ¶ 68; Dkt. 48-10 at NYU000674. In the same email, Ogbara stated that Plaintiff "may be eligible for an extended leave of absence as an accommodation under the ADA" and instructed her "to submit an updated ADA form to clarify how you wish to proceed and whether you will be return [sic] with no restrictions or seeking an extended leave." J56.1 ¶ 69; Dkt. 48-10 at NYU000674. On October 4, 2021, Plaintiff submitted revised ADA paperwork. J56.1 ¶ 70. Her requested additional leave was approved on October 13, 2021, and extended until January 8, 2022. *Id.*

During Plaintiff's leave, Mehta circulated a revised MICU protocol (the "MICU Call Out Policy") requiring Advanced Practice Providers to email her or the covering manager with a minimum of six hours' notice for emergency situations, and twelve hours for non-emergencies. *Id.* ¶ 27, 144. Plaintiff confirmed in her deposition that she received the protocol. *Id.* ¶ 144.

### C. Plaintiff's Second Accommodation Request and Temporary Accommodation

On January 7, 2022, the day before her approved leave was scheduled to end, Plaintiff submitted a new accommodation request. *See* Dkt. No. 48-15 at NYU000876. The only accommodations Plaintiff requested were reduced shift hours, with maximum 10-hour shifts, and reassignment to a vacant APP position with maximum 10-hour shifts. *Id.* at NYU000878. On

the same day, Mehta wrote to Dr. Hagedorn that she was going to see if she could "backfill" Plaintiff's shifts in the MICU but was told that she needed to continue to hold open Plaintiff's position. J56.1 ¶ 92. On January 11, 2022, Davidson identified a temporary position available through April 13, 2022—which was subsequently extended to April 23, 2022—that could accommodate Plaintiff's request for 10-hour shifts. *Id.* ¶¶ 88–89. On January 12, 2022, Plaintiff accepted the accommodation and acknowledged that the accommodation was temporary and only for a period of 90 days. *See* Dkt. No. 55-36 at NYU002363.

Plaintiff returned to work on January 13, 2022. J56.1 ¶ 93. During the 90-day period in which she was in her temporary position, Plaintiff worked with the Human Resources Department to apply for APP positions in other NYU departments that offered 10-hour shifts. Plaintiff applied for approximately two dozen such positions but did not receive any offers. *Id.* ¶¶ 93, 97; Pl.'s Rep. 56.1 ¶ 39. Karen Kaplan, an Internal Career Planning Specialist at NYU, had several calls with Plaintiff during this period to discuss her applications and reached out to various departments on Plaintiff's behalf. *Id.* ¶¶ 101, 103, 104, 106; Dkt. No. 55 ¶ 1.

### D. Plaintiff's Third Accommodation Request

On April 11, 2022, Plaintiff provided a doctor's note renewing her request for an accommodation to work 10-hour shifts through July 8, 2025. J56.1 ¶ 116. As the end of Plaintiff's temporary position approached, MICU personnel exchanged emails about her return to the MICU and the MICU's inability to accommodate 10-hour shifts. Mehta sent Mellynchuk information on the undue burden that accommodating the request would impose on the MICU. *Id.* ¶ 121. Davidson expressed similar concerns about the MICU's ability to accommodate 10-hour shifts. *Id.* ¶ 120. Davidson explained:

> The MICU is a high acuity area that requires prolonged standing,
> responding to medical emergencies, manual dexterity, heavy lifting, and

7

working the current shift length of 11.5 hours. The shift cannot be changed
for 15 co-workers in order to accommodate one.

*Id.*[3]  In addition, Davidson wrote that he "do[es] not have any other positions or areas available

that can accommodate 10 hour or less shifts." *Id.*  On Monday, April 18, 2022, Mellynchuk

informed Plaintiff of the hospital's inability to meet her requested accommodation.  He wrote:

> [W]e are unable to approve your proposed accommodation in your current
> role as it would unduly burden your colleagues and negatively affect
> patient care in your department. Specifically, scheduling you to work a
> unique shortened shift on your unit would affect patient care during shift
> transitions and require coworkers to cover in your absence on a daily
> basis.
>
> ***
>
> Please consider this confirmation that there are no assignments available
> that are consistent with your proposed shift schedule.
>
> ***
>
> If you are unable to return to your home unit on the standard shift schedule
> by April 24, 2022, you may be released from employment as we are
> unable to continue to hold a vacancy on this unit.

*Id.* ¶ 122.

On Wednesday, April 20, 2022, Mehta responded to Mellynchuk's email to Plaintiff and

provided Plaintiff a schedule for her MICU shifts for the period of April 24 to May 21.  *Id.*

¶ 128.  Mehta requested that Plaintiff respond by Friday, April 22 at 10 A.M.  *Id.* ¶ 129.  On

Thursday, April 21, 2022, Davidson also asked Plaintiff to confirm receipt of the email.  *Id.*

¶ 130.  Plaintiff responded on Friday, April 22, 2022, stating that she had acknowledged receipt

of Mellynchuk's email directly.  *Id.* ¶ 131.  Mellynchuk, Davidson, and Mehta understood

Plaintiff's response as confirmation of the proposed schedule, including that she intended to

---

[3] In his sworn testimony, Davidson clarified that the reference to an 11.5 hour shift reflected the
hospital's "terminology to describe a shift as 11.5-hours, which does include a one-hour break" even
though the shift lasted 12.5 hours in total. *See* Dkt. No. 50 ¶ 46.

return to the MICU on Monday, April 25, 2022. Pl.'s Rep. 56.1 ¶ 42. On Saturday, April 23, Plaintiff deliberately removed Mehta and Davidson from the email chain and emailed only Mellynchuk, stating: "After much deliberation, I'm not able to return to the MICU standard shift schedule by the effective date of 4/24/22." J56.1 ¶ 141. Plaintiff understood that Mellynchuk was not her direct supervisor, but still did not follow up with him to confirm that he received her email or that Mehta or Davidson would be informed of her decision. *Id.* ¶¶ 143, 145.

### E. Plaintiff's April 20, 2022 Complaint

Plaintiff separately emailed Mellynchuk on April 20, 2022 to report three "incidents of intimidation, harassment, & retaliation" in the MICU. *Id.* ¶ 146. These incidents involved (i) two dates in which Plaintiff was offered overtime work, "demonstrating a blatant disregard," in Plaintiff's view, for her 10-hour shift accommodation; (ii) purported hostile work incidents that were not appropriately addressed; and (iii) allegations that Mehta shared her confidential medical information with a colleague. Dkt. No. 51-22 at NYU001986. During her deposition, Plaintiff addressed these complaints, stating that she was never required to work overtime, Mehta apologized to Plaintiff for the mention of a medical appointment, and she could not recall any other incidents of the MICU being an unsafe environment. *See* J56.1 ¶¶ 148–50.

### F. Plaintiff's Termination

On Monday, April 25, 2022, the day she was scheduled to return to work, Plaintiff sent Mehta a text message stating "I would like to respectfully inform you that I will not be on MICU shift – HR was notified. Please refer to them for any questions." Dkt. No. 49-52 at NYU002689.[4] Mehta subsequently emailed Davidson and Mellynchuk, stating "[a]t 6:53am,

---

[4] Plaintiff does not dispute that she sent this message but denies that the message informed Mehta that she would not be coming into work. *See* Pl.'s Rep. 56.1 ¶ 45.

before the 7am shift start time I received this message from Sophi who had confirmed she is

returning to the MICU . . . it has caused a lot of chaos to now reach out ot [sic] the team in a

matter seven minutes so let them know that now the provider will not be coming and the

assignments need to be reshuffled." J56.1 ¶ 137.  Davidson responded "I agree that this is very

disruptive and cannot continue. It is unsafe." *Id.* ¶ 138.  Mellynchuk advised that they could

"proceed with release for failure to return from leave and also insufficient notice of the absence."

*Id.* ¶ 139.  Davidson provided a termination letter to Plaintiff the same day. *Id.* ¶ 140.  In

NYU's internal system, Davidson characterized Plaintiff's termination as "failure to return/job

abandonment." *Id.* ¶ 152.  After her termination, Plaintiff was not paid for her accrued unused

vacation time. *Id.* ¶¶ 153–54.

## II.    PROCEDURAL HISTORY

Plaintiff initiated this action on January 18, 2023. *See* Dkt. No. 1.  On January 19, 2023

the case was referred for mediation. *See* Dkt. No. 4.  The parties participated in mediation on

June 23, 2023. *See* Dkt. No. 30.  Fact discovery concluded on November 27, 2023. *See* Dkt.

No. 40.  On December 1, 2023, the case was referred to Magistrate Judge Aaron for settlement.

*See* Dkt. No. 32.  The parties participated in a settlement conference on January 24, 2024, which

was unsuccessful. *See* Dkt. No. 41.  On February 16, 2024, the case was reassigned to the

undersigned.  On April 1, 2024, Defendant moved for summary judgment on all claims. *See*

Dkt. No. 46; Dkt. No. 47 ("Br.").  Plaintiff opposed the motion on May 6, 2024, *see* Dkt. No. 58

("Opp. Br.")[5], and Defendant filed its reply on June 10, 2024. *See* Dkt. No. 63 ("Rep. Br.").

---

[5] Defendant argues that Plaintiff abandoned her retaliation, wage reduction, and whistleblower claims by failing to address them in her opposition brief. *See* Rep. Br. at 25.  "Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014).  Here, the Court finds that Plaintiff abandoned only her whistleblower claim.  Plaintiff's opposition brief discussed a number of the elements required to establish

## DISCUSSION

### I.    LEGAL STANDARD

"Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Williams v. N.Y.C. Dep't of Health & Mental Hygiene*, 299 F. Supp. 3d 418, 424 (S.D.N.Y. 2018) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party moving for summary judgment bears "the initial burden of demonstrating the absence of a genuine dispute of material fact." *See Brown v. Metro. Dental Assocs.*, No. 21-CV-0851 (CM), 2023 WL 5154415, at *4 (S.D.N.Y. Aug. 10, 2023) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The non-moving party cannot rely upon "conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Rather, it "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)). In deciding a motion for summary judgment, the Court

---

retaliation and wage reduction. *See, e.g.* Opp. Br. at 1, 14, 17. Although these discussions were subsumed under Plaintiff's discussion of her discrimination claims, the papers as a whole do not support a showing of abandonment as to the retaliation and wage reduction claims. In contrast, Plaintiff's opposition brief did not address any of the arguments raised by Defendant as to why summary judgment is appropriate for her whistleblower claim. Accordingly, the Court deems that claim abandoned.

must "construe the evidence in the light most favorable to the Plaintiff[], drawing all reasonable inferences and resolving all ambiguities in [its] favor." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 118 (2d Cir. 2013) (quoting *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 151 (2d Cir. 2012)).

## II.   DISABILITY DISCRIMINATION CLAIMS

Plaintiff brings disability discrimination claims under the ADA, NYSHRL, and NYCHRL for failure to provide reasonable accommodation and for adverse employment action.

The ADA prohibits discrimination "on the basis of disability in regard to . . . [the] discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. "Disability discrimination claims under the ADA 'may be brought under a theory of adverse employment action or of failure to provide reasonable accommodation.'" *Gilani v. Deloitte LLP*, No. 23-CV-04755 (JMF), 2024 WL 4042256, at *5 (S.D.N.Y. Sept. 4, 2024) (quoting *Samuels v. City of New York*, No. 22-CV-01904 (JGK), 2023 WL 5717892, at *6 (S.D.N.Y. Sept. 5, 2023)). Discrimination claims under the ADA are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima-facie case of discrimination under the ADA. *See id.* "Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions." *Garcia v. Kings Cnty. Hosp. Ctr.*, No. 16-CV-03151 (ER), 2018 WL 389212, at *4 (S.D.N.Y. Jan. 11, 2018) (citing *McDonnell*, 411 U.S. at 803). The burden ultimately shifts back to the plaintiff to demonstrate that the reason proffered by the defendant is a pretext for discrimination. *Id.*

The NYSHRL similarly prohibits employers from discharging or discriminating against individuals "in terms, conditions, or privileges of employment" because of an individual's disability. N.Y. Exec. Law § 296. "A claim of disability discrimination under the [NYSHRL] ... is governed by the same legal standards as govern federal ADA claims." *Tafolla v. Heilig*, 80 F.4th 111, 119 (2d Cir. 2023) (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006)). Accordingly, the Court analyzes Plaintiff's ADA and NYSHRL discrimination claims together.

The NYCHRL prohibits an employer from discriminating against persons "in compensation or in terms, conditions or privileges of employment" because of their disability. N.Y.C. Admin. Code § 8-107(1)(a)(3). Claims under the NYCHRL are analyzed "'separately and independently from any federal and state law claims' because the NYCHRL sets a lower bar for actionable claims." *Parker v. Israel Disc. Bank of New York, Inc.*, No. 24-688-CV, 2025 WL 1779219, at *3 (2d Cir. June 27, 2025) (citing *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).

### A. Failure to Accommodate Claims

#### 1.    ADA and NYSHRL

"It is well established that 'discrimination' under the ADA includes a failure to provide an employee with a reasonable accommodation for his or her disability." *Williams v. N.Y.C. Dep't of Health & Mental Hygiene*, 299 F. Supp. 3d 418, 425 (S.D.N.Y. 2018) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 183–84 (2d Cir. 2006)). To establish a prima facie case of discrimination for failure to accommodate under the ADA and NYSHRL, "a plaintiff must show by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) . . . [her]

employer refused to make a reasonable accommodation." *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020)). Ultimately, "the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment.'" *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (quoting *McBride*, 583 F.3d at 97).

Plaintiff cannot establish a *prima facie* case of discrimination for failure to accommodate under the ADA and NYSHRL because she could not perform the essential functions of her job.[6] To determine the essential function of a job, courts in this Circuit "conduct[] a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice," in which they "draw[ ] all inferences in favor of the non-moving party." *Tafolla*, 80 F.4th at 119 (quoting *McMillan*, 711 F.3d at 126). Factors relevant to whether an aspect of a job is an essential function "include the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." *McMillan*, 711 F.3d at 126 (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)). In assessing whether a job function is essential, "a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Shannon v. N.Y.C. Transit Auth.*, 332

---

[6] The parties dispute whether Plaintiff was a person with a disability under the meaning of the ADA at the time she was terminated. *See* Br. at 14–16; Opp. Br. at 7–11. The Court need not decide this prong because even assuming for purposes of this motion that Plaintiff was a person with a disability at the time of her termination, she cannot establish a *prima facie* case for failure to accommodate or adverse employment action because she was unable to perform the essential functions of her job.

F.3d 95, 100 (2d Cir. 2003) (quoting *D'Amico*, 132 F.3d at 151).  Finally, "[a] reasonable accommodation can never involve the elimination of an essential function of a job."  *Id.*

Here, the employer's judgment, the work experience of past and current employees, and the record evidence all establish that the ability to work a 12.5-hour shift was an essential function of Plaintiff's job in the MICU.[7]  *See McMillan*, 711 F.3d at 126.  Multiple NYU personnel testified or proffered sworn declarations that the ability to work a 12.5-hour shift schedule was critical to patient safety because it allowed for the provider to conduct patient hand-offs at the beginning and end of each shift.  For example, in her sworn declaration, Mehta stated: "[m]ost importantly and critical to patient care and safety is the handoff at the beginning and the end of each 12.5-hour shift."  Dkt. 49 ¶ 43.  She explained that the handoff is essential "because this is where the existing staff finalizes their notes and explains the status of patients to the incoming shift to ensure proper continuity of care."  *Id.*  Mehta echoed these statements in her deposition, in which she described the handoff as "incredibly important; it tells you what happened in the prior 12 to 24 hours, what's going on with the patient, what needs to happen." *Id*; *see also* Dkt. No. 48-21 at 116:9–117:15.  Mehta further testified that her clinical observations had "[o]verwhelmingly" shown that multiple hand-offs during a shift resulted in "miscommunication" that "absolutely affects patient care."  Dkt. No. 48-21 at 117:3–14.

The importance of the 12.5-hour shift to maintaining patient safety is affirmed throughout the record.  Carolyn Wray-Williams, the Director of Advance Practice Providers of NYU

---

[7] While theoretically a hospital could schedule ICU providers on three 8.5 hour shifts per 24-hour period or some other arrangement, NYU had all ICU providers scheduled for shift changes twice a day, with two overlapping 12.5 hour shifts per day.  Thus the point is not whether the particular length of the shift was essential in the abstract, but rather the function of the shift routine in ensuring safe and effective hand-over of patient care.  An essential function of the job, then, is the ability to work a schedule in which the provider is present at the same start and end time as all other providers—which in the case of NYU's MICU meant 12.5 hour shifts.  *See infra* pp. 15-17.

Langone Hospitals stated in her sworn declaration that the hospital "simply do[es] not allow" APPs to miss the handoff of their patents because doing so "puts patient safety at risk" and "the Hospital cannot (and will not) compromise patient safety to accommodate any one employee." Dkt. No. 54 ¶¶ 1, 7. Wray-Williams further explained that "[w]orking a 12.5-hour shift and being present for the transition periods are essential functions of the MICU APP job" and an APP "would not be able to work in the MICU" if they could not work a 12.5-hour shift. *Id.* ¶¶ 7, 8. Multiple doctors affirmed the necessity of participating in handoffs to maintain patient safety. *See* Dkt. No. 52 ¶ 29 ("The handoff between shifts is critical because this is where the existing staff finalizes their notes and explains the status of patients to the incoming shift to ensure patient safety and care"); Dkt. No. 53 ¶ 16 ("The MICU standard of care is to have one provider per shift who is knowledgeable about their patients and can perform the handoff to the next shift."); *Id.* ¶ 25 ("It is non-negotiable that patient safety takes precedence over all else, and Ms. Cilus' need for a reduced shift schedule could not be accommodated in the MICU, where continuity is paramount in caring for the Hospital's sickest patients."). Accordingly, no reasonable juror could conclude that working a 12.5 hour shift was not an essential function of Plaintiff's job as a MICU APP.

Plaintiff does not dispute the necessity of the handoffs at the beginning and end of the 12.5-hour shift to ensuring patient safety. Rather, she argues "the claim that a 12.5-hour shift was an essential function for MICU employees is undercut by NYU's permitting other MICU employees to work reduced shift hours." Opp. Br. at 11. Plaintiff points to three examples to support her argument that a 12.5-hour shift was not an essential function of her job. First, she cites to schedules for December 19, 2022 and May 1, 2023 in which certain APPs were scheduled to work seven-hour shifts. *See* Opp. Br. at 11, n.58. Second, Plaintiff states that two

other employees—"Employee #1" and Ingrid Gunther-Bell—worked part-time shifts. *See* Opp.
Br. at 11, 18–20. Close examination of each of these examples reveals that they do not support
Plaintiff's argument.

First, as to the December 19, 2022 and May 1, 2023 schedules, Mehta stated in her sworn
declaration that the shortened schedules were "limited exceptions in emergency situations"
because other providers had called out and required emergency coverage. Dkt. No. 64 ¶ 9. The
evidence cited by Plaintiff does not cast this explanation into doubt. Accordingly, these limited
emergency exceptions do not negate the extensive record evidence that working a 12.5-hour shift
was an essential function of the job. Second, as to Gunther-Bell, Plaintiff does not dispute that
Gunther-Bell still worked 12.5-hour shifts even as a part-time employee. J56.1 ¶ 156. Thus,
Gunther-Bell's ability to work *fewer shifts* as a part-time employee (as opposed to shifts of
shorter length) has no bearing on whether Plaintiff could perform the essential functions of her
job. Third, as to Employee #1, the record demonstrates that he was present for the full 12.5-hour
shift with the exception of his lunch break. Employee #1 needed to work a modified schedule
because he required "continuous and intermittent FMLA leave to address a medical condition."
*Id.* ¶ 160. The record evidence demonstrates that Employee #1 "incorporated his one-hour lunch
break into his leave time mid-shift," Dkt. No. 50 ¶ 65, and used that time to attend necessary
medical appointments outside the MICU. Thus, at all times, he "was present during the start and
end of his shift, was present for both morning and evening patient rounds, and worked a full
12.5-hour shift, often coming in early or staying late, as needed, to make sure all critical patient
information was properly conveyed." *Id.* Accordingly, Employee #1's schedule does not
undercut Defendant's claim that working a 12.5 hour shift was an essential function of the job.

Ultimately, the record evidence demonstrates that providing Plaintiff's requested accommodation would have impeded her ability to perform the essential functions of her job. "A reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon*, 332 F.3d at 100. Plaintiff therefore cannot establish that "with reasonable accommodation, [she] could perform the essential functions of the job at issue." *Lievre v. JRM Constr. Mgmt., LLC*, No. 17-CV-04439 (BCM), 2019 WL 4572777, at *12 (S.D.N.Y. Sept. 20, 2019).[8] Accordingly, Plaintiff cannot establish a *prima facie* case of discrimination for failure to accommodate under the ADA or NYSHRL.

Furthermore, despite Plaintiff's inability to perform the essential functions of her job, the undisputed record demonstrates that Defendant still provided multiple reasonable accommodations to Plaintiff. First, when Plaintiff was unable to resume her normal duties in September 2021, Defendant offered to allow her to extend her previously approved leave. *See* J56.1 ¶ 69–70. Second, when Plaintiff returned from this extended leave period in January 2022, Defendant found a temporary position in a different unit that accommodated Plaintiff's need for a 10-hour shift. *See* J56.1 ¶ 88. Third, while she was in the temporary position, NYU internal career specialists worked with Plaintiff to assist her in applying to roles in other NYU departments that could accommodate her need for a 10-hour shift. *Id.* ¶¶ 101, 103, 104, 106.

---

[8] During her deposition, Plaintiff testified that, starting in October 2021, she could have worked a 12-hour shift with breaks. *See* Dkt. No. 48-2 at 258:18–261:22. However, the record demonstrates that Plaintiff repeatedly requested a maximum of 10-hour shifts, supported by documentation from her physician, through at least July 8, 2022. *See* Dkt. No. 48-15 at NYU000877–78 (January 7, 2022 accommodations request for "maximum 10 hour shifts"); Dkt. No. 51-9 at NYU002380–81 (April 11, 2022 email from Plaintiff attaching a doctor's note stating that she can "work a maximum of ten (10) hours per shift" through at least July 8, 2022); J.56.1 ¶ 116. Plaintiff cannot meet her burden to show that she could have performed the essential function of her job through "mere speculation," particularly where, as here, the record does not support Plaintiff's assertion that she was able to work 12-hour shifts or that she conveyed to Defendant that she was either willing or able to work the required shifts. *Jackan v. New York State Dep't of Lab.*, 205 F.3d 562, 566 (2d Cir. 2000).

Fourth, Defendant held open Plaintiff's position in the MICU for the duration of her temporary assignment. *Id.* ¶¶ 92, 120. As Plaintiff's temporary assignment was ending, Defendant continued to search for available positions that could accommodate Plaintiff but found that there were no "other positions or areas available that can accommodate 10 hour or less shifts." *Id.* at ¶ 120.

Defendant's actions were consistent with the requirements of the ADA. Despite Plaintiff's contentions otherwise, *see* Opp. Br. at 25, Defendant was not required to place Plaintiff in a new role in a different department because "[n]othing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers," *Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 655 (S.D.N.Y. 2001) (quoting *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)), *aff'd*, 324 F.3d 102 (2d Cir. 2003), and Plaintiff did not receive any offers for the positions she interviewed for in other departments. Additionally, "employers are not required to create new jobs or reassign disabled employees if no positions are vacant." *Id.* Here, despite not being required to do so, Defendant found a new position for Plaintiff that accommodated her needs for a temporary 90-day period, and held open her original position for her during that time in hopes she could return to full duty in that position. When the period elapsed and Plaintiff still requested shifts shorter than 12.5 hours, there were no vacant positions that could have accommodated Plaintiff's needs consistent with NYU's existing policies on departmental transfers (which required applying for and being selected for a vacant position). Thus, even though Plaintiff could not perform the essential functions of her job (and thus cannot make out a *prima facie* case of discrimination under the ADA and NYSHRL), Defendant nonetheless complied with the reasonable accommodation requirements of those laws.

## 2.    NYCHRL

Even under the more lenient standard of the NYCHRL, Plaintiff's failure to accommodate claim cannot survive summary judgment.  Under the NYCHRL, "a plaintiff who cannot perform the essential functions of his job with a reasonable accommodation cannot succeed on a failure-to-accommodate claim."  *Abdelsayed v. N.Y. Univ.*, No. 23-1144, 2024 WL 2828414, at *1 (2d Cir. June 4, 2024) (citing *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 834-35 (2014)).  Unlike the ADA and NYSHRL, for claims brought under the NYCHRL, the "employer, not the employee, has the pleading obligation to prove that the employee could not, with reasonable accommodation, satisfy the essential requisites of the job."  *Brown v. N.Y.C. Dep't of Educ.*, 806 F. App'x 45, 49 (2d Cir. 2020) (quoting *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885, 998 (2013)).

Here, Defendant has met its burden of establishing that Plaintiff could not "satisfy the essential requisites of the job" even with reasonable accommodations, because the specific accommodations requested by Plaintiff prohibited her from satisfying the job's essential requirements.  As discussed *supra*, Defendant proffered multiple sworn declarations and deposition testimony demonstrating that working a 12.5-hour shift was an essential function of being an APP in the MICU.  *See, e.g.*, Dkt. No. 54 ¶¶ 1, 7.  Accordingly, Defendant has met its burden of demonstrating that Plaintiff could not perform the essential functions of her job and that the accommodations she required were not reasonable or compatible with those essential functions.  *See Snowden v. Trs. of Columbia Univ.*, 612 F. App'x 7, 10 (2d Cir. 2015) (affirming dismissal of failure to accommodate claims under the NYCHRL where, as here "even with the burden resting on the employer, as it does under the NYCHRL—[Plaintiff] could not perform the essential functions of her position, with or without a reasonable accommodation.").

The Court therefore GRANTS summary judgment to Defendant on Plaintiff's failure to accommodate claim under the ADA, NYSHRL, and NYCHRL.

### B. Adverse Employment Action Claims

#### 1. ADA and NYSHRL

Plaintiff also brings claims of discrimination under the ADA and NYSHRL based on an adverse employment action. To establish a *prima facie* case of discrimination under the ADA and NYSHRL based on an adverse employment action, a plaintiff must demonstrate:

> (a) their employer is subject to the ADA; (b) they are disabled within the meaning of the ADA or perceived to be so by the employer; (c) they were otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) they suffered an adverse employment action because of their disability.

*Vitti v. Macy's Inc.*, 758 F. App'x 153, 156 (2d Cir. 2018). For the same reasons discussed above, Plaintiff cannot establish the third element of her *prima facie* case because, based on her professed need to work a maximum 10-hour shift, she was not qualified to perform an essential function of her job "with or without reasonable accommodation." *Id.*

#### 2. NYCHRL

Plaintiff's disability discrimination claim based on adverse employment still fails under the more liberal standard of the NYCHRL. "To state a claim for discrimination [under the NYCHRL], a plaintiff 'need only show that her employer treated her less well, at least in part for a discriminatory reason.'" *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 123 (S.D.N.Y. 2020) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013)). In response, "the employer may present evidence of its legitimate, nondiscriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played *no* role in its actions." *Id.* Here, the record clearly establishes that

Plaintiff was terminated for a non-discriminatory reason; the undisputed evidence in the case shows that NYU personnel terminated plaintiff "for failure to return from leave and also insufficient notice of the absence" in violation of the MICU's policies. J56.1 ¶¶ 139–40. As set forth in greater detail in Section III(A) *infra*, Plaintiff offers no evidence to demonstrate that discriminatory intent played a role in her termination.

Accordingly, summary judgment in favor of Defendant is GRANTED as to Plaintiff's adverse employment action claims under the ADA, NYSHRL, and NYCHRL.

## III.    RETALIATION CLAIMS

### A.    ADA

Retaliation claims brought under the ADA are also subject to the *McDonnell Douglas* burden-shifting framework. *Jones-Cruz v. Brookdale Hosp. Med. Ctr.*, No. 19-CV-06910 (MMG), 2025 WL 1617193, at *11 (S.D.N.Y. June 6, 2025). Thus, if Plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to Defendant to show a legitimate, non-retaliatory rationale. If Defendant can provide such proof of a non-retaliatory motivation, then in order to avoid summary judgment, Plaintiff must show that the proffered non-retaliatory reason is pretextual." *Id.* (internal references omitted).

To establish a *prima facie* case for retaliation under the ADA, Plaintiff must prove: "(1) she engaged in protected activity; (2) the defendant was aware of this activity; (3) the defendant took an adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* (citing *Getso v. City Univ. of New York*, No. 08-CV-07469 (LAP), 2009 WL 4042848, at *5 (S.D.N.Y. Nov. 18, 2009)).

Plaintiff alleges that NYU engaged in three instances of retaliation, all of which "stemmed from" her protected activity of requesting FMLA leave: NYU (i) entered a performance improvement plan for Plaintiff; (ii) denied her accommodation request; and

(iii) presented her with "an ultimatum of working without restriction or termination," and ultimately terminated her.  Opp. Br. at 19–20.  Plaintiff also alleges that she engaged in protected activities by filing a renewed accommodations request on April 10, 2022 and submitting a complaint about the MICU as a workplace on April 20, 2022.  *See id.* at 14.  As an initial matter, the first two elements of the *prima facie* case are undisputed:  Plaintiff engaged in the protected activities of requesting FMLA leave, requesting accommodations, and submitting a complaint, and Defendant was aware of these activities.  *See* Br. at 29; *see also Stoler v. Inst. for Integrative Nutrition*, No. 13-CV-01275, 2013 WL 6068598, at *10 (S.D.N.Y. Nov. 18, 2013) ("Requests for FMLA leave are protected activity"); *Wells v. Achievement Network*, No. 18-CV-06588 (KPF), 2021 WL 810220, at *11 (S.D.N.Y. Mar. 2, 2021) ("Protected activities include requests for reasonable accommodations"); *Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-07114 (MKB) (SMG), 2017 WL 9487194, at *9 (E.D.N.Y. Aug. 23, 2017) ("complaining to a supervisor, whether formally or informally, is considered protected activity") *report and recommendation adopted*, No. 14-CV-07114 (MKB) (SMG), 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017).

Plaintiff is able to establish the third element of the *prima facie* case only in regard to her termination.  "The issuance of a performance improvement plan to an employee is simply not an adverse employment action."  *McGrath v. Thomson Reuters*, No. 10-CV-04944 (JSR) (JCF), 2012 WL 2119112, at *11 (S.D.N.Y. Apr. 30, 2012), *report and recommendation adopted*, No. 10-CV-04944 (JSR) (JCF), 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd*, 537 F. App'x 1 (2d Cir. 2013).  Similarly, the denial of an accommodation request does not, in and of itself, constitute an adverse employment action.  *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019) ("[Plaintiff's] claim that he was denied breaks to go home and take his medicine

and go to the pharmacy, even if related to his disability, do not rise to the level of a material adverse employment action"); *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 457 (S.D.N.Y. 2023) ("[A] failure to provide a reasonable accommodation in and of itself does not equate to an adverse employment action in the disability discrimination context.") (internal references omitted).  In contrast, a termination is "the prototypical adverse employment action."  *Scott v. YSB Servs. Inc.*, No. 21-CV-07711 (VSB), 2024 WL 1330043, at *5 (S.D.N.Y. Mar. 28, 2024).  Thus, only Plaintiff's termination can satisfy the third prong required to establish a *prima facie* case of retaliation.[9]

Finally, Plaintiff meets the fourth prong required to establish a *prima facie* case of retaliation because of the temporal proximity between her engagement in protected activities and her termination.  Plaintiff submitted a renewed accommodations request on April 11, 2022, *see* J56.1 ¶ 116, and emailed Mellynchuk on April 20, 2022 describing incidents of "intimidation, harassment, & retaliation," *see* J56.1 ¶ 146.  For the reasons discussed above, both of these events constituted protected activities.  Plaintiff was terminated on April 25, 2022, two weeks after sending her renewed accommodations request and five days after submitting her complaint. J56.1 ¶ 140.  The temporal proximity between Plaintiff's engagement in protected activities and her termination sufficiently establish a causal connection between the alleged adverse action and the protected activity at this initial stage of the inquiry.  *See, e.g.*, *Bonura v. Chiarlitti*, No. 08-CV-10190 (CS), 2010 WL 11712789, at *11 (S.D.N.Y. Mar. 31, 2010) ("two weeks is certainly

---

[9] The record suggests some question about whether it is even appropriate to describe Plaintiff as having been terminated, rather than resigning upon being told she would have to accept 12.5 hour shifts. *See, e.g.,* Def.'s Rep. 56.1 ¶ 141; J56.1 ¶ 122, 152.  However, Plaintiff could potentially characterize this resignation as a constructive termination due to the denial of her requested accommodations.  In any event, the Court need not dwell on this point, as Plaintiff cannot prevail even if the end of her NYU employment was a termination.

sufficient temporal proximity to infer causation"). Thus, Plaintiff has sufficiently established a *prima facie* case of retaliation under the ADA.

Turning next to the second step in the *McDonnell Douglas* framework, Defendant has met its burden because it provided a legitimate, non-retaliatory rationale for Plaintiff's termination: that she "abandoned" her position by declining the work schedule offered to her and violated MICU policy regarding notice. The undisputed record shows that the MICU call-out policy required Plaintiff to call Mehta or her covering manager and provide a minimum of six hours' notice of any absences, *see* J56.1 ¶ 144, and that Plaintiff was terminated because she informed Mehta that she would not be returning to the MICU only 58 minutes before the scheduled start time of her shift, *see id.* ¶¶ 137–40. "Unquestionably, violation of company policy is a legitimate, nondiscriminatory reason for an employer to terminate the employment of an employee." *Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of New York City, Inc. Emp. Benefit Funds*, No. 17-CV-07895 (DF), 2020 WL 5209779, at *10 (S.D.N.Y. Sept. 1, 2020), *aff'd*, No. 20-3092, 2021 WL 4851384 (2d Cir. Oct. 19, 2021). Defendant has thus met its burden under the second step in the *McDonnell Douglas* framework by providing a non-discriminatory reason for Plaintiff's termination.

Plaintiff is unable to establish that Defendant's legitimate reason for terminating her was a pretext for retaliation. Plaintiff makes several arguments that Defendant's rationale is pretextual, none of which are persuasive. First, Plaintiff argues that NYU's termination letter "[d]irectly reference[d]" her protected activity of taking FMLA leave and thus precludes summary judgment. *See* Opp. Br. at 12. But, when read in its full context, the letter supports Defendant's argument that it terminated Plaintiff because of her violation of company policy. The portion of the letter at issue states:

25

> You were asked to confirm youjr [sic] shift schedule by April 22, 2022 at 10am. Today, April 2[5], 2022, you did not report to work as scheduled. Moreover, you notified your manager at 6:02am that you would not be coming to your scheduled shift, 58 minutes before the scheduled start time of 7am. Prolonged absence from the unit negatively impacted patient care and burdened your coworkers. Additionally, your failure to provide advanced notice of your absence is severely disruptive to service on the unit. For these reasons, you are released from employment effective immediately.

J56.1 ¶ 140. Plaintiff claims that the reference to "[p]rolonged absence from the unit" refers to her FMLA leave. *See* Opp. Br. at 12–13. However, Plaintiff provides no evidence for this interpretation and it is clear from the full context of the letter that the prolonged absence referenced is Plaintiff's absence from the unit on the day she did not report to work as scheduled, and that the basis for Plaintiff's termination is her violation of the MICU call-out policy. The record as a whole likewise provides no basis for a conclusion that Plaintiff's FMLA leave played any role in her termination (indeed, to the contrary, NYU appears to have made serious efforts to hold Plaintiff's job open for her and find other suitable work until she could return to her prior position (although they were not required to do so)). Plaintiff's argument rests on pure speculation and that is insufficient at summary judgment, particularly when weighed against the record evidence countering her conclusory say-so. *See, e.g.*, *Young v. Ltd. Brands*, No. 11-CV-02927 (KBF), 2013 WL 5434149, at *9 (S.D.N.Y. Sept. 25, 2013) (granting summary judgment on a retaliation claim where Plaintiff had only offered "mere speculation" that Defendant's proffered reason for her termination were pretextual and '[s]uch conjecture cannot establish pretext.'" (quoting *Kolenovic v. ABM Indus. Inc.*, 361 F. App'x 246, 249 (2d Cir. 2010)).

Second, Plaintiff argues that NYU's deviation from its standard policies and procedures support her claims of pretext. *See* Opp. Br.at 15. Although Plaintiff alleges that Defendant deviated from its typical policies and procedures on several instances, only one of those instances—terminating Plaintiff without first issuing a corrective action—relates to her

termination.  See *Tu Ying Chen v. Suffolk Cnty. Cmty. Coll.*, 734 F. App'x 773, 776 (2d Cir.

2018) ("Even if Defendants deviated procedurally in some way, none of those deviations

reasonably affected their [adverse action] decision or raise the specter of a discriminatory

pretext.").  Plaintiff's allegation that terminating her without issuing corrective action deviated

from NYU's policies and procedures lacks evidentiary support.  NYU provided sworn testimony

stating that no corrective action was required where, as here, an individual was not terminated

for performance reasons, *see* Dkt. No. 65 ¶ 6, and Plaintiff does not offer any evidence to dispute

that statement.

Finally, Plaintiff argues that her termination was "the culmination of a series of

retaliatory events beginning shortly after her request for leave in June 2021."  Opp. Br. at 20.

The events Plaintiff cites occurred in May and June of 2021, *see id.* at 19–20, more than a year

before Plaintiff was terminated, and Plaintiff provides no evidence to suggest that these events

had any impact on the decision to terminate her.  Accordingly, Plaintiff cannot establish a claim

of retaliation under the ADA.  The Court GRANTS summary judgment in favor of Defendant on

Plaintiff's ADA retaliation claims.

### B.  NYSHRL and NYCHRL

Plaintiff's NYSHRL and NYCHRL claims fail for substantially the same reasons.  To

establish a *prima facie* case of retaliation under the NYSHRL and NYCHRL, a plaintiff must

prove "identical" elements to those required by the ADA "except that the plaintiff need not prove

any 'adverse' employment action; instead, [she] must prove that something happened that would

be reasonably likely to deter a person from engaging in protected activity."  *Wright v. City of

New York*, No. 23-CV-03149 (KPF), 2024 WL 3952722, at *10 (S.D.N.Y. Aug. 27, 2024)

(quoting *Leon* v. *Columbia Univ. Med. Ctr.*, No. 11-CV-08559 (NSR), 2013 WL 6669415, at

*12 (S.D.N.Y. Dec. 17, 2013)).  Once the plaintiff has established a *prima facie* case, the same

burden-shifting framework applies. *See Gordon v. City of New York*, No. 14-CV-06115 (JPO), 2018 WL 4681615, at \*16 (S.D.N.Y. Sept. 28, 2018). Because Plaintiff has established a *prima facie* case under the ADA, she has satisfied her initial burden of establishing a *prima facie* case under the more lenient standards of the NYSHRL and NYCHRL. However, Plaintiff's retaliation claims under the NYSHRL and NYCHRL still fail because—for the same reasons as set forth above with regard to Plaintiff's ADA claim—Plaintiff was terminated for a legitimate non-discriminatory reason, and Plaintiff has offered no evidence (and certainly not evidence that a rational jury would credit) to show that the reason was pretextual. The Court GRANTS summary judgment in favor of Defendant on Plaintiff's NYSHRL and NYCHRL retaliation claims.

### C. FMLA

Retaliation claims under the FMLA are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016). Under the first step, "to establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that 1) [s]he exercised rights protected under the FMLA; 2) [s]he was qualified for his position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)). Retaliatory intent can be established "when there is a basis for a jury to conclude that 'a causal connection [exists] between the plaintiff's protected activity and the adverse action taken by the employer.'" *Donnelly*, 691 F.3d at 152 (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir. 2003)). Plaintiff cannot establish a prima facie case of retaliation because the circumstances of her termination do not give rise to retaliatory intent. Plaintiff was approved to take FMLA leave through September 29, 2021, *see* Pl.'s Rep. 56.1 ¶ 21, was granted an

additional extended leave through January 2022, *see* J56.1 ¶ 70, and was terminated on April 25, 2022, *see id.* ¶ 140.  "The six month gap between protected activity and adverse employment action is too long to amount to sufficient temporal proximity permitting an inference of causation."  *Weston v. Optima Commc'ns Sys., Inc.*, No. 09-CV-03732 GBD, 2012 WL 752440, at *7 (S.D.N.Y. Mar. 8, 2012).

Because Plaintiff cannot establish temporal proximity, she must "set forth evidence of 'retaliatory animus directed against [the] plaintiff by the defendant' during that span of time." *Id.* (quoting *Blanco v. Rogan*, 620 F.Supp.2d 546, 554–55 (S.D.N.Y. 2009)).  Plaintiff points to statements made by Mehta between June 2021 and January 2022 as evidence of retaliatory animus.  *See* Opp. Br. at 19–20.  These statements cannot support an inference of retaliatory animus because Plaintiff was offered the opportunity to return to her job in the MICU several months after these statements were made.  Additionally, Mehta routinely communicated with Plaintiff and others at NYU during this period to facilitate Plaintiff's return to the MICU.  *See* J56.1 ¶¶ 115, 118, 122, 134; *Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med.*, No. 11-CV-08934 (AJN), 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014) ("[T]he record reflects significant efforts by [Defendant] to allow [Plaintiff] to return to work that are inconsistent with a claim that her termination was retaliatory.").  Finally, Plaintiff alleges that NYU formalized her PIP after she requested FMLA leave and entered her PIP into its electronic system while she was on leave.  Opp. Br. at 16.  The undisputed record demonstrates that the PIP process that culminated in formalizing Plaintiff's PIP and entering it into NYU's system began months *before* Plaintiff requested FMLA leave.  *See* J56.1 ¶ 31, 38, 41.  Accordingly, that Plaintiff was placed on a formal PIP cannot constitute retaliatory animus for engaging in

protected activities. Summary judgment is therefore GRANTED in favor of Defendant on Plaintiff's FMLA retaliation claims.

## IV.  UNLAWFUL WAGE DEDUCTION CLAIM

Finally, Plaintiff alleges that NYU violated the NYLL by unlawfully refusing to pay Plaintiff for her unused vacation time. Under the NYLL, "[a]n employee entitlement to receive payment for accrued, unused vacation time upon termination of employment is governed by the terms of the employer's publicized policy." *Tubo v. Orange Reg'l Med. Ctr.*, 690 F. App'x 736, 740 (2d Cir. 2017). Defendant alleges that withholding Plaintiff's unused vacation pay was consistent with its policy because the policy provides for such withholding when an employee fails to provide sufficient notice of resignation. Br. at 34. Plaintiff alleges that this provision only applied to employee resignations and that her termination does not fall into that category. Opp. Br. at 17.

The record evidence supports Plaintiff's argument. The policy the parties cite states: "failure to provide sufficient written notice shall result in loss of payment for any unused accrued/earned vacation time (exclusive of carryover time which is not payable under any circumstance) at the time of termination." *See* Dkt. No. 51-21 at PL0160. However, that statement is only in the section of the policy that discusses employee resignations. *Id.* The policy defines a resignation as "a voluntary separation from employment by an employee." *Id.* In contrast, the policy defines a "discharge" as "an involuntary separation from employment for cause" and a "release" as "an involuntary separation from employment for reasons of a non disciplinary nature." *Id.* Although Defendant claims that Plaintiff's termination was considered a resignation, *see* Br. at 15, the termination letter provided by Plaintiff stated that she was "released from employment," J56.1 ¶ 140, and that she did not follow MICU policies. These

statements suggest that Plaintiff's termination could be characterized as a "discharge" or

"release." If Plaintiff's termination was a "discharge" or "release" under the terms of NYU's

policy, then Plaintiff would be entitled to her unused vacation time under the policy. *See Tubo*,

690 F. App'x 736, 740 (2d Cir. 2017). Because a jury could reasonably find that Plaintiff's

termination constituted a discharge or release, Defendant's motion for summary judgment is

DENIED as to Plaintiff's unlawful wage deduction claim.

## CONCLUSION

For the foregoing reasons, Summary Judgment is GRANTED in favor of Defendant as to

Plaintiff's ADA, NYSHRL, NYCHRL, FMLA, and NYLL whistleblower claim, but DENIED as

to Plaintiff's NYLL unlawful wage reduction claim.

Dated: September 18, 2025
       New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge